

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00180-CV

_____

IN THE INTEREST OF A.P., B.P., D.P., AND A.P., CHILDREN

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-701923-21

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant B.P. (Mother) appeals the trial court's order terminating her parental rights to her children A.P. (Andrew), B.P. (Billy), D.P. (David), and A.P. (Amy) (collectively the Children).[1] The trial court found that the Department of Family and Protective Services had proved four conduct-based grounds for termination and that termination was in the Children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (P), (b)(2). The trial court awarded permanent managing conservatorship of the Children to the Department. In two issues, Mother contends that the evidence is legally and factually insufficient to support termination of her parental rights and that the trial court abused its discretion by admitting certain evidence. We will affirm.

## II. BACKGROUND

### A. The Family's Prior CPS History

In 2017, Mother tested positive for amphetamine and methamphetamine use.[2] This concerned Child Protective Services (CPS) because Mother was one of the

---

[1]To protect the identities of the Children, we use aliases to refer to them, their parents, and others connected to this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]Amphetamine is a metabolite of methamphetamine. *See In re C.W.*, No. 02-21-00252-CV, 2022 WL 123221, at *7 n. 9 (Tex. App.—Fort Worth Jan. 13, 2022, no pet.) (mem. op.); *In re R.A.*, No. 02-18-00252-CV, 2019 WL 490121, at *3 (Tex. App.—Fort Worth Feb. 7, 2019, no pet.) (mem. op.).

primary caretakers of her children.[3]  Mother also allowed Father to fire a gun while the children were in the home asleep.  CPS investigated the family and ruled out physical abuse towards Billy, David, Andrew, and Alicia by Father but found "reason to believe" neglectful supervision towards the children by both parents.[4]  The children were removed from Mother and Father's home and placed with family out of state. However, the children were back living with Mother and Father by September of that year, when CPS again investigated allegations of neglectful supervision and drug use. Both parents were given multiple drug tests, which they passed, and CPS ruled out neglectful supervision.

In January 2018, CPS investigated allegations that Mother was still using methamphetamine.  But she again tested negative for all substances, and CPS ruled out neglectful supervision.  In March 2018, Mother gave birth to Amy.

The family relocated often, and CPS investigated allegations of physical neglect in January 2020 after the family was evicted from their apartment.  Although CPS was concerned that the children did not look to be in good shape, the investigator ruled

---

[3]The youngest child the subject of this termination case, Amy, was not yet born in 2017.  Mother and Father had another daughter, whose initials are also A.P. and whom we will refer to as Alicia, who ran away in December of 2020 and is not a party to this case.

[4]After investigating allegations of child abuse or neglect, CPS will assign one of five possible dispositions: (1) reason to believe (based on a preponderance of the evidence); (2) ruled out; (3) unable to complete; (4) unable to determine; or (5) administrative closure.  *C.W.*, 2022 WL 123221, at *6 n. 7.

out physical neglect towards all five of the children by either parent. In December of that year, CPS investigated allegations that David was being put into a box. There were also concerns that Mother and Father had been inconsistent with picking up the children and that the children were being "abandoned" at the end of the day. CPS ruled out the allegations of physical abuse but assigned the disposition "Unable to Determine" to the neglectful-supervision allegations against both parents. That same month, the parents reported that Alicia had run away "with some guys."[5]

## B. Post-2020 Investigation and Removal

Before running away, Alicia accused her father of physical abuse and claimed that she was left at home alone for extended periods of time without food. She also told Tarquetta Jones, a CPS investigator, about "some domestic violence between the parents." Jones interviewed Alicia, Billy, and David at school and the other children and Mother and Father at the hotel where they were living at the time. While they were at the hotel, police arrived in response to a complaint about child abuse. Mother told Jones that she was not going to do anything the Department asked of her. Jones returned to the hotel multiple times but was eventually told that the family was no longer there. She then had a special investigator (SI) assigned to the case. The SI found that the family was still staying at the hotel, and he saw Father there. Father told the SI that the family was in the process of getting "a long-term place to live."

---

[5]According to the Department, Alicia had been on "runaway status" since December 20, 2020.

Father also made an appointment to meet with the SI but did not keep it. The SI made continued attempts to talk to the family but had no further contact with them at the hotel after that one brief encounter with Father.

In May 2021, Father was arrested and charged with possession of methamphetamine—a felony. *See* Tex. Health & Safety Code Ann. §§ 481.102(6), 481.115(b). The SI visited Father in jail and interviewed him. Father admitted that he used methamphetamine and told the SI that the methamphetamine he was caught possessing had "nothing to do with" Mother. On June 14, 2021, the Department closed the CPS case Jones had been working on since December with the disposition "Unable to Complete" assigned to the allegations against Mother and Father of neglectful supervision and physical abuse towards all the children and emotional abuse towards Alicia. Allegations of refusal to accept parental responsibility towards Alicia were ruled out.

Late on the night of June 16, 2021, North Richland Hills Police informed the Department that two officers had found the family "squatting" in a home that did not belong to them. Night Response Investigator Joel Juarez responded to the scene, where the officers expressed concern that Mother and Father had used their smaller children to break into the home through a window in the back. One of the officers stated that this had been the second time he knew the family had broken into a home. He also told Juarez that he had concerns that Mother was possibly under the influence of mind-altering substances—pills. Juarez was unable to gain access to the home

5

where the family had been squatting, but the police informed him that the only food found in the home was cake. The children were very hungry, and food from McDonald's had to be brought to them because they had not eaten all day. Both officers expressed concerns that Mother and Father were not truthful with the police and had been providing them false information. Mother was arrested that night for warrants on outstanding tickets and was later charged with criminal trespass and making false reports to peace officers. Both Mother and Father were indicted with burglary of a habitation for squatting in the home where they were found.

Juarez spoke to Father, who admitted to using marijuana but denied using methamphetamine. Juarez confronted Father about his admission to using methamphetamine the previous month. Father denied making that admission and told Juarez that the "pipe" that was found in his possession was his friend's and not his. He told Juarez that he did not know of anybody that could come and assist with the children.

Juarez also talked to Billy, who was five years old at the time. Billy told Juarez that Mother and Father fought. He pointed to a car window and said his family had "broken glass" but did not give further details. Juarez discussed the case with his superiors and was advised to remove the children. At the CPS office, Andrew, the oldest son, told Juarez that the family have moved from hotel to hotel and were looking for a house. Juarez observed that Andrew was constantly checking up on his brothers and younger sister and would delegate orders to each of his siblings, who in

turn would listen to him. He would answer for his siblings when questions were asked. Andrew admitted that he personally potty-trained Amy and that he is the one who cares for the kids.

The Children went into foster care on June 17, 2021. Andrew and Amy were placed in a foster home together, and Billy and David (the twins) were placed in a different foster home. Mother, Father, and the Department agreed to a temporary visitation schedule whereby Mother and Father were allowed to visit the Children once a week and communicate with them through phone calls, texts, and email. Jones, Juarez, and others met with Mother and Father and developed a family plan of service to assist the family and make sure the Children were safe.

On July 22, 2021, the trial court held a full adversary hearing, *see* Tex. Fam. Code Ann. § 262.201(a), (e), and ordered Mother and Father "to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." The service plan included requirements that Mother and Father complete parenting classes and a drug and alcohol assessment, as well as random drug testing, a mental health assessment, and individual counseling. Mother was specifically required to "refrain from any criminal activity." Mother refused to comply with these or any other provisions of the court-ordered service plan, and on

December 11, 2021, she was arrested for possession of methamphetamine.[6] Father was arrested for burglary of a habitation on January 14, 2022.

The trial court held multiple permanency hearings ahead of the final trial, *see* Tex. Fam. Code Ann. § 263.002, and made further orders for both parents to submit to drug tests by urinalysis and hair strand. Mother took only one drug test, a urinalysis on April 8, 2022, which came back negative for any drugs. Father tested positive for amphetamine and methamphetamine on March 31, 2022.

## C. Trial

This case proceeded to trial on May 17, 2022. Neither Mother nor Father was present at the trial.[7] All the investigators testified as witnesses for the Department. Jones described Mother as "very abrasive and not cooperative" in their first interaction. Mother had told Jones that she felt harassed by the Department, that none of the allegations were true, and that she was not going to cooperate or do anything that the Department asked her to do. Jones testified that she was concerned about Mother's history of drug use and had asked her multiple times to take a drug test. Mother claimed that she had taken several drug tests in the past outside of the Department, they were negative, and she did not need to test for the Department.

---

[6]The record reflects that Father was arrested on the same date but does not indicate the reason for his arrest.

[7]Mother appeared only through her attorney. Father was pro se, and the trial court found that he was duly and properly notified and wholly made default. Father has not appealed.

Mother got "very angry" and "upset" when Jones contacted her about taking drug tests and asked Jones never to contact her again. According to Jones, Mother said the allegations against her "were all lies."

Jones also testified about her interviews with Alicia, Billy, and David. Over an objection from Mother's attorney, Jones testified that Alicia made an outcry of physical abuse by Father, complained of being left at home alone for extended amounts of time without food, and said that there had been domestic violence between the parents when the Children were present. Alicia also showed Jones a video of Mother and Father that Jones found "concerning."[8] Jones assigned the disposition "reason to believe" to the parents' latest CPS case.

Juarez testified about his work on this case, including his interviews of Father, Andrew, and Billy. He also explained that there were "concerns about the children being self-sufficient." He testified that Andrew's acting as a caretaker was "typically a sign of neglectful supervision"—something the Department sees "a lot of times where children are . . . left to their own devices [because] parents are out doing things, not necessarily good things." He added that the Children "really relied on [Andrew] . . . for control of the situation" and "for comfort." Juarez also recalled Father representing himself at a prior hearing in this case. According to Juarez, Father was

---

[8]When Jones began to testify about the contents of the video, Mother's attorney objected, and the trial court sustained the objection. The video was not offered in evidence and is not in the appellate record.

"very upset" with him, the Department, and everything that had happened and was talking out loud while witnesses were testifying. Juarez also testified that he "saw no immediate signs of malnourishment" when he saw the Children on the night of June 16, 2021. He could tell they had not bathed in a few days, but the Children did not have "eminent hygiene issues." None of the Children asked him about their parents.

Alyssa Dougharty, a permanency specialist, testified as the Department's final witness. She testified that from the beginning, she had concerns with the family "instability and drug usage and some mental health concerns for [Mother]." Dougharty testified to the parents' lengthy CPS history and that she had been part of the development of the service plan in this case. She testified that Mother and Father were given a copy of the service plan and had an opportunity to have it explained to them. They did not agree to work their required services; they claimed that they were good parents and that the Children were not removed for any legal reasons and should never have been removed. Even after a contested show-cause hearing, both parents maintained that "the investigators lied" and that the Children were not removed legally. Dougharty testified that neither parent made any progress on any of her concerns. Mother never started or completed any of her required services. Father signed up for parenting classes in November 2021 but did not start them or any of his other services.

Dougharty also testified about Mother's December 2021 arrest. She testified that Mother admitted that she had methamphetamine on her but that, at the time, she had been looking for her missing daughter and had to encounter some "sketchy" people, one of whom had the methamphetamine. Dougharty explained that a parent is mentally unable to care for children if she is under the influence of substances and that the Department does not want any children around that type of environment. She further testified that Father had tested positive for methamphetamine in March 2022 but stated that "he did not know how the tests were positive[,] as he is randomly drug tested through his job, and he was negative previously the prior month." Dougharty testified to thirteen occasions on which the parents were asked to take drug tests, and Mother did not show up to take any of them. Father tested positive for methamphetamine and amphetamine the only time he took a requested test.

Dougharty testified that neither parent demonstrated an ability to provide their children with a safe and stable environment. Mother had indicated to her that she was selling houses as a realtor and was living at her boss's house in Tyler, Texas, but she never gave Dougharty an address for the house. In addition, there was no evidence that Mother was a realtor. Similarly, Father told Dougharty that he lived in a small one-bedroom apartment but never gave Dougharty the address, only a ZIP code. He claimed he made steady income as a car mechanic, but Dougharty never received verification of this. In the wintertime, both parents represented to Dougharty that they had just finished construction on a house, but they never

11

provided an address for that either. Even after Dougharty had explained to the parents that she needed to know where they were living so that she could view the residence and "ensure that the home [was] safe and free of hazards for the children and to see if there[ were] any other members possibly residing in that home to run background checks to make sure that they[ were] cleared and okay to be around the children," the parents still did not give her any home addresses.

Dougharty further testified that, when the Children first came into foster care, they were "really shut off, hyperactive, [and] unable to pay attention[ or] focus." She also testified to some concerning behaviors that the three youngest siblings had; Amy was "very defiant" and "very upset most of all [sic] the time" and did not want to listen to the foster parents, and the twins were very chaotic and destructive. At the time of trial, they had been doing better. Therapies were put in place for all the Children to address the Department's concerns. Billy and David were both prescribed Adderall, and Billy was also taking Guanfacine. Dougharty testified that services were available for the foster parents or any future placements. She described Andrew as still being "shut off" and "really down and depressed recently." He liked to stay to himself and spent most of his time in his bedroom, which he had stated he did with his biological family as well. She testified that the Children required more attention and a keener eye than other children in her caseload, and she did not think that either Mother or Father was able to provide that necessary level of care. She

12

testified that the Children's current placements were able to meet their physical and emotional needs.

Dougharty also testified that both Mother and Father made the vast majority of their scheduled weekly visits with the Children. She confirmed that the Children were happy to see their parents and interacted with and hugged them. However, she also testified that Mother and Father would bring the Children coloring books and toys, most of which did not work, "so the kids just really kind of looked at them." They would also bring the Children "open containers of grapes, some stuff from 7-Eleven, sodas, [and] some energy drinks." Amy started getting really sick after the visits, and the trial court ordered that all foods the parents brought to the visits had to be presealed and prepackaged.

Dougharty also witnessed Mother try to show the Children photographs of the "home" that she claimed Father and she had, but the "home" pictured was just a construction center, not a completed house like she had represented to Dougharty. Mother also told the Children that they would be going home soon and that they should not be in foster care. Dougharty testified that these false promises led to behavior issues. She did not believe that *any* of the Children should be returned to the parents:

> The children were removed due to instability, drug usage, mental health concerns. We put services in place to address those concerns, such as: The random drug testing, the mental health evaluation, drug and alcohol assessment, individual counseling . . . .

13

. . . .

However, [the parents] never completed or started any of those services, and they never elevated any of those concerns that we had since the beginning of this case.

Dougharty also testified that, despite extensive efforts to find a placement option for the Children with relatives, the Department had not located a safe, stable placement for the Children—other than their current foster homes. She testified that the foster parents were not adoption-motivated, but the Department would continue looking for adoption-motivated placements, as well as placements where the Children could all be together. Ultimately, the Department planned to have all the Children adopted as a sibling group.

Charging instruments from the parents' criminal cases, alleging four offenses committed by Mother and two by father—all within the span of a couple months in 2021—were admitted in evidence without objection. Mother had been charged with criminal trespass, two counts of making a false report to a peace officer, and burglary of a habitation; Father had been charged with possession of methamphetamine and burglary of a habitation. Dougharty testified that neither Mother nor Father had been found guilty of any of these allegations, and the cases were still ongoing. She explained why the court terminating Mother and Father's parental rights was in the Children's best interests:

> As stated previously, . . . the concerns at the beginning were drug usage, instability, mental health concerns. Again, . . . services were put in place to address those concerns for the parents; however, throughout the

14

entirety of the case, the parents have never addressed any of those concerns that we've had. They've actually just . . . stated that the children shouldn't be removed[,] and they fought constantly against everything and made no progress and shown no evidence of any behavorial [sic] changes or anything . . . .

The trial court found by clear and convincing evidence that termination of each parents' relationship with the Children was in the Children's best interest and that both parents had

> . . . knowingly placed or knowingly allowed the [Children] to remain in conditions or surroundings which endanger the physical or emotional well-being of the [Children], pursuant to § 161.00l(b)(l)(D), Texas Family Code;
>
> . . . engaged in conduct or knowingly placed the [Children] with persons who engaged in conduct which endangers the physical or emotional well-being of the [Children], pursuant to § 161.00l(b)(l)(E), Texas Family Code;
>
> . . . failed to comply with the provisions of a court order that specifically established the actions necessary for the [parents] to obtain the return of the [Children] who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the [Children]'s removal from the parent under Chapter 262 for the abuse or neglect of the [Children], pursuant to § 161.00l(b)(l)(O), Texas Family Code;
>
> . . . used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the [C]hildren, and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance, pursuant to § 161.00l(b)(l)(P), Texas Family Code[.]

*See* Tex. Fam. Code Ann. § 161.001(b). The trial court entered an order terminating Mother's and Father's parental rights. Mother appeals from this order.

## III. DISCUSSION

In the first of her two issues, Mother argues that no evidence or insufficient evidence supports the trial court's findings and that the trial court erred in permitting hearsay testimony of what a child told an investigator. Because the evidence is legally and factually sufficient to support the trial court's findings under Family Code Subsections 161.001(b)(1)(D) and (E) and to support the trial court's best-interest finding, and because any error in the admission of the hearsay testimony was harmless, we will overrule Mother's issues and affirm the trial court's termination order.

## A. Sufficiency of the Evidence

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

Due process demands the heightened standard of clear and convincing evidence because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012)

16

(quoting *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982));

*J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *E.R.*, 385 S.W.3d at 554 (citing *Santosky*, 455 U.S. at 747-48, 102 S. Ct. at 1388). For the same reason, we carefully scrutinize termination proceedings and strictly construe involuntary-termination statutes in the parent's favor. *E.N.C.*, 384 S.W.3d at 802; *E.R.*, 385 S.W.3d at 563; *Holick*, 685 S.W.2d at 20–21.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d at 266. That is, we consider evidence favorable to the finding if a

17

reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved one or more of the conduct-specific grounds on which the termination was based and that the termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

### 1. Analysis of the (D) and (E) grounds for termination

Because the evidence pertaining to Subsections (D) and (E) is interrelated, we conduct a consolidated review of those subsections. *See In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.); *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.).

18

Subsections (D) and (E) provide that the trial court may order the termination of a parent's rights if it finds by clear and convincing evidence that the parent has

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

"Endanger" means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under Subsection (D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. The conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *Id.* Given the nature of environment-based endangerment, it logically follows that the relevant timeframe for an environment-based endangerment finding under Subsection (D) is prior to the child's removal. *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *9 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied). Illegal drug use by the parents and drug-related criminal activity by the parents "likewise support[] the conclusion that the children's surroundings endanger their physical or emotional well-being." *J.T.G.*, 121 S.W.3d at 125.

19

Under Subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See id.*; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Id.*; *Boyd*, 727 S.W.2d at 533. The specific danger to a child's well-being may be inferred from parental misconduct standing alone. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id.* Illegal drug use and its effect on the parent's life and her ability to parent may establish an endangering course of conduct. *Id.* Criminal activity that exposes the parent to incarceration may also endanger a child. *In re I.L.*, No. 02-18-00206-CV, 2018 WL 5668813, at *5 (Tex. App.—Fort Worth Nov. 1, 2018, no pet.) (mem. op.); *In re A.N.D.*, No. 02-12-00394-CV, 2013 WL 362753, at *2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.). Endangering conduct is not limited to actions directed towards the child. *Boyd*, 727 S.W.2d at 533. It necessarily follows that the endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage. *J.O.A.*, 283 S.W.3d at 345. We may consider conduct that occurred outside the child's

presence in our review. *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Here, the evidence shows a history of drug usage and criminal activity on Mother's part, culminating in an unstable living environment that endangered the physical or emotional well-being of the Children. This was evident in the conditions in which the Children were found when they were removed and the behavior issues they displayed when they first went into foster care.[9] Investigator Juarez personally witnessed eight-year-old Andrew acting in a parental role toward his younger siblings, which Juarez testified is "typically a sign of neglectful supervision . . . where children are left to their own devices." He linked the Children's behavior to "the family's lack of cooperation and bouncing around from place to place," and he testified that the Children "really relied on Andrew . . . for control of the situation."

Mother argues that the Department "presented no evidence that [Mother]'s children were ever seen, found, or believed to be in any condition or surrounding which endangered their physical or emotional wellbeing." We cannot agree. The evidence at trial painted a grim picture of the conditions and surroundings in which Mother had placed the Children. In 2017, when she was the mother of four young

_____

[9]"According to the investigator," Mother writes in her appellate brief, "the children all were happy, healthy, clothed, fed, and clean." Mother does not specify which "investigator" she is referring to here, but Investigator Juarez testified at trial that he "could tell that [the Children] hadn't bathed . . . in a few days, [and t]hey were very hungry. . . . McDonald's had to be brought in because they hadn't eaten all day."

21

children, Mother tested positive for amphetamine and methamphetamine use. About a month later, police responded to an incident wherein Father brought out a gun and shot it in their apartment. CPS removed the children for neglectful supervision by the parents. After regaining custody of their then-four children, rather than improve their lifestyle, Mother and Father continued to shuffle their family around from impermanent home to impermanent home, and they had another child in the process. Their eldest daughter, Alicia, disappeared after making an outcry of abuse and showing Investigator Jones a "concerning" video of Mother and Father.

In early 2021, when Mother and Father were again being investigated for neglectful supervision and physical abuse, Father told Investigator Lee that they were still "in the process of . . . getting . . . a long-term place to live." Mother and Father continued to elude investigators until Father was arrested for possession of methamphetamine in May, just over a month before the Children were removed. Father admitted to using methamphetamine and marijuana, and both Mother and Father acknowledged that the pipe found during Father's arrest was used for smoking methamphetamine. By the time of removal, Mother and Father had both been arrested and had evidently used their Children to break into someone else's home, where the family was found living as squatters. Additionally, Mother and Father had failed to keep the Children well-fed; Investigator Juarez testified that, when he first met the Children late that night, they were "very hungry" and had not eaten all day.

22

Mother also argues that "[n]o evidence was presented that [Mother] or [F]ather had used or were using any illegal drugs in the presence of the children" and that "[n]o evidence was presented that the children were ever exposed to any illegal drug or dangerous condition." The following testimony by Investigator Jones belies Mother's argument:

Q. And was there also discussion of [Father]'s arrest?

A. Yes.

Q. And what was the discussion regarding [Father]?

A. We asked about *a pipe being found during the arrest.* And [Mother and Father] denied that it was their pipe, that it was some guy they picked up on the street.

Q. So they acknowledged there was a pipe?

A. Yes.

Q. And what did they acknowledge regarding the pipe was used for?

A. Meth.

Q. Okay. [Father] was charged criminally for that; is that correct?

A. Yes.

. . . .

Q. (BY [THE DEPARTMENT]) Is it concerning to you that they were even putting any weight towards that story that someone gave them a pipe or was responsible? Is it concerning that they were even around someone with a meth pipe?

A. Yes.

Q. Okay. Why?

A. *Because the children were with them.*

Q. Okay. Were the children residing in a home or a car, or where were they residing with them?

A. I think they were squatting at a home during that time. [Emphasis added.]

In addition to the pre-removal conduct we have discussed, the trial court also heard testimony and saw evidence that Mother and Father continued to abuse drugs after the Children were removed. Mother admitted that she had methamphetamine on her in December 2021, and Father tested positive for methamphetamine and amphetamine less than two months before the termination trial. This, combined with the evidence of Mother's amphetamine and methamphetamine use in 2017 and her repeated failure to take drug tests when asked by the Department—or ordered by the trial court—supported an inference that she was endangering the Children by using illegal drugs. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (stating that factfinder "could reasonably infer that appellant's failure to complete the scheduled screenings indicated she was avoiding testing because she was using drugs"); *In re E.R.W.*, 528 S.W.3d 251, 264–65 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being."); *In re M.M.*, No. 04-21-00463-CV, 2022 WL

24

1096381, at \*4 (Tex. App.—San Antonio Apr. 13, 2022, no pet.) (mem. op.) ("Mother's failure to drug test is considered a positive test result under the law and supports an inference that she is still using drugs."). Such an inference is not rendered unreasonable by the evidence that Mother intermittently tested negative, especially in light of her erratic behavior, transient living situation, and consistent refusal to complete or even attempt to complete her service plan or to cooperate with the Department, all of which are consistent with drug abuse.

Further, the trial court could reasonably have found that Mother knowingly placed the Children with Father, who was abusing illegal drugs, and that she endangered the Children's emotional well-being by making false promises to them. Whether we view the evidence in the light most favorable to the judgment or weigh all of the disputed evidence, *see In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018), a reasonable factfinder could form a firm belief or conviction that Mother (1) knowingly placed or knowingly allowed the Children to remain in conditions or surroundings that endangered the physical or emotional well-being of the Children and (2) engaged in conduct or knowingly placed the Children with persons who engaged in conduct that endangered the physical or emotional well-being of the Children. Thus, the evidence is legally and factually sufficient to support the trial court's two endangerment predicate findings under Subsections (D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) and (E). Because only one finding alleged under Section 161.001(b)(1) is necessary to support a termination order, we need not address

25

the sufficiency of the evidence to support the trial court's two other predicate findings. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O), (P); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re D.M.*, 58 S.W.3d 801, 813 (Tex. App.—Fort Worth 2001, no pet.).

## 2. Analysis of the best-interest finding

Mother also challenges the legal and factual sufficiency of the trial court's finding that termination was in the Children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *A.C.*, 560 S.W.3d at 631. In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)  the [child's] desires . . . ;

(B)  the [child's] emotional and physical needs[,] . . . now and in the future;

(C)  the emotional and physical danger to the child now and in the future;

26

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)     the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

In this case, only one factor—the Children's desires—weighed neither in favor of nor against termination of Mother's parental rights to the Children. None of the Children testified at trial, and all four of them were under ten at the time of trial and therefore too young to express their desires. *See In re J.G.*, No. 02-20-00038-CV, 2020 WL 3410503, at *7 (Tex. App.—Fort Worth May 28, 2020, no pet.) (mem. op.) (holding trial court was entitled to find that this factor weighed neither in favor of nor

27

against termination when none of the children testified at trial, none of their maturity levels were shown at trial, and some of the children were too young to express their desires); *In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied) (holding desire-of-child factor as neutral where children did not testify at trial and there was no evidence showing sufficient maturity of children ages nine, eight, six, and five years old being able to express a living preference). The other *Holley* factors all weigh in favor of the trial court's finding that termination of Mother's parental rights was in the Children's best interest.

Dougharty testified to the Children's emotional and physical needs and that they required more attention and a keener eye than other children in her caseload. She also testified that neither Mother nor Father was able to provide the necessary level of care, but the Children's current placements were able to meet their physical and emotional needs. Further, the trial court could have likewise inferred that Mother's drug problems were going to continue and that, because Mother had a continuing pattern of drug abuse, she did not have the ability to meet the Children's physical and emotional needs now and in the future. *See In re N.H.*, No. 02-22-00157-CV, 2022 WL 4374638, at *13 (Tex. App.—Fort Worth Sept. 22, 2022, no pet. h.) (mem. op.).

At the time of removal, the Children were found squatting in a home, they had not eaten all day or been bathed in a few days, and the only food for them to eat was cake. The evidence also showed that Mother had used (or at least possessed) illegal

28

drugs when the Children were with her and that she continued to use drugs after the removal. Dougharty also testified about Mother's false promises to the Children and the behavioral issues that manifested afterward. The trial court could reasonably have inferred from this evidence that Mother's bad parenting posed an emotional and physical danger to the Children and that she would place the Children in emotional or physical danger if they were returned to her. Based on the same evidence, as well as Dougharty's testimony that a parent is "mentally unable to care for children" if she is under the influence of drugs like what Mother had been using, the trial court also could have reasonably doubted Mother's parental abilities. By contrast, there is no evidence in the record that the Children were in any emotional or physical danger in their foster homes. Dougharty actually testified to how much better the Children had been doing since they were removed and placed in foster care. According to Dougharty, the Children's current placements are able to meet their physical and emotional needs.

Dougharty also testified about the therapies that had been put in place for the Children and that those programs would be available for the foster parents or any placements in the future. Dougharty also explained the different means the Department was using to connect the Children with adoption-motivated foster parents. When considering this factor—the programs available to assist the individuals seeking custody to promote the Children's best interests—the contrast between Mother and the Department is even more marked. Mother consistently

29

refused to cooperate with the Department or address any of its concerns, even amid very serious allegations and even after the Children were removed and she was faced with losing her parental rights to them. Mother's uncorroborated claims that she was working on her services and receiving counseling through a provider outside of the Department do not shift this factor in Mother's favor, especially considering her pattern of drug use. *See* Tex. Fam. Code Ann. § 263.307(b)(10) (considering willingness and ability of family to complete counseling services); *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (fifth *Holley* factor weighed against mother who completed parts of Department's family services plan but continued to use drugs and never completed entire program); *Robinson v. Tex. Dep't of Protective & Regul. Servs.,* 89 S.W.3d 679, 688–89 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (upholding termination in children's best interest when mother continued to use drugs and left ameliorative family support programs incomplete). In fact, the trial court reasonably could have disbelieved that Mother received any counseling or other services at all; Mother never signed a release of information or gave Dougharty any contact information to confirm that Mother was actually doing these services. *See In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *17 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op.) ("On this record, questioning Mother's credibility was not unreasonable.").

The Children were not in adoption-motivated foster homes. However, the trial court had no evidence before it of Mother's plans for the Children. Mother's

30

position, as relayed through Dougharty's testimony, appeared to have been that the Children should not have been removed. She told the Children that they would be "going home soon" and that they should not be in foster care. The trial court may have reasonably inferred from this that Mother wanted the Children back in her custody, but she had no specific plans for them if she regained custody. The Department's plans, on the other hand, were to have the Children adopted all together as a sibling group. Generally, it is in a child's best interest to keep siblings together whenever possible. *A.O.*, 2022 WL 1257384, at *14.

We cannot speculate as to the stability of some prospective home into which the Children might be placed someday, but we can see from the record that, in the years leading up to the termination, Mother did not provide a stable, permanent home for the Children. We have stressed that "children need permanency and stability," *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied), and that stability and permanence are "paramount" in the upbringing of children. *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied). Dougharty testified that Mother "had a history of . . . stating she lived somewhere and never providing proof of that." Mother and Father had stated that they were living in a new home and "that they finished the construction surprisingly fast," but the photograph of the "home" that Mother showed the Children did not match what she had described. Because Mother was "[u]nstable herself," she had no stability to offer the Children. *M.S.*, 2021 WL 2654143, at *19. A reasonable factfinder could infer from

31

the testimony at trial that, while the Children's current foster placements may not be permanent, they are safe and stable.

Mother's obstinate refusal to complete her court-ordered services also indicates that her parent–child relationship with the Children was not a proper one. Dougharty testified that both parents were provided a copy of the service plan "[m]ultiple times" and had an opportunity to have it explained to them. Even after Dougharty discussed with Mother the importance of completing the services, Mother still insisted that there was "no reason" for her to work on her services. The only excuse Mother offered was that the Children were not legally removed. As Dougharty put it,

> services were put in place to address those concerns [of drug usage, instability, and mental health] for the parents; however, throughout the entirety of the case, the parents have never addressed any of those concerns that we've had. They've actually just . . . stated that the children shouldn't be removed[,] and they fought constantly against everything and [have] made no progress and shown no evidence of any [behavioral] changes or anything . . . that would [indicate they were able] to properly care for the children.

The trial court, as factfinder, could have reasonably inferred from these acts or omissions that Mother did not want her children back, as she steadfastly refused to do what needed to be done to secure their return (and her parental rights). Additionally, the Children's behavioral issues and significant improvement in foster care, as well as Mother's drug use, false representations to the Children, and failure to bathe or feed the Children or provide them with a safe, stable, permanent home all indicate that

32

their parent–child relationship was not a proper one. David even told Dougharty that he would "still be okay" if he never got to see his parents again.

In sum, not one of the nine *Holley* factors weighs against the trial court's best-interest finding. One factor is neutral, and the rest weigh in favor of the trial court's finding, some strongly so. Taken together, Mother's "inability to provide a stable home[ or] remain gainfully employed, and her failure to comply with the service plans and successfully complete drug treatment all support the trial court's finding that termination was in the [C]hildren's best interest." *In re D.C.*, 128 S.W.3d 707, 717 (Tex. App.—Fort Worth 2004, no pet.). Viewing the evidence in the light most favorable to the trial court's best-interest finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of Mother's parental rights is in the Children's best interest. *See J.F.C.*, 96 S.W.3d at 266. Further, based on our exacting review of the entire record and giving due deference to the factfinder's findings, we likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19. Thus, under the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's finding by clear and convincing evidence that termination of the parent–child relationship between Mother and the Children is in the Children's best interest. *See J.G.*, 2020 WL 3410503, at *10. Accordingly, we overrule Mother's first issue.

## B. Hearsay

In her second issue, Mother argues that the trial court erred in allowing, over Mother's objection, Investigator Jones to testify as to hearsay statements made by Alicia about alleged abuse:

Q. Now, [Alicia] is not a part of this case; is that correct?

A. Correct.

Q. And why is she not a part of this case?

A. She eventually ran away.

Q. Okay. And when did that occur?

A. I think December of 2020. Yup.

. . . .

Q. Okay. And the first -- at the beginning of this case, you interviewed, you said, the children.

A. Uh-huh.

Q. Let's go back to that. Where did you meet [Alicia]?

A. At school.

Q. And did you discuss the concerns with [Alicia]?

A. Yes.

Q. And did she make any outcries of abuse or neglect?

A. She did.

Q. And what were those outcries?

A. Physical abuse --

[MOTHER'S ATTORNEY]: Objection. Hearsay.

THE COURT: Overruled.

Q. (BY [THE DEPARTMENT]) You can answer.

A. Physical abuse by the father and then being left at home -- home alone for extended amounts of time, not having food, and she also voiced some domestic violence between the parents.

The Department responds that Mother's argument regarding hearsay lacks merit, that the hearsay at issue "is clearly not inadmissible hearsay," that Mother has presented no argument to show harm, and that the record establishes no harm occurred. We agree with the Department that Mother has failed to show harm.

Even when clear and convincing evidence justifies termination, we may reverse a judgment and remand the case to the trial court if it reversibly erred by admitting evidence. *See* Tex. R. App. P. 44.1; *Tex. Dep't of Hum. Servs. v. White*, 817 S.W.2d 62, 63 (Tex. 1991) (applying predecessor to rule 44.1). "Hearsay" means a statement that (1) the declarant does not make while testifying at the current trial or hearing and (2) a party offers in evidence to prove the truth of the matter asserted in the statement. Tex. R. Evid. 801. Hearsay is not admissible unless a statute or other rule prescribed under statutory authority provides otherwise. Tex. R. Evid. 802. Once the opponent of hearsay evidence makes the proper objection, it becomes the burden of the proponent of the evidence to establish that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n.5 (Tex. 2004).

35

Applying these rules to Alicia's "outcries," we first address the Department's contention that Alicia's statement (as referenced by Jones) "was not offered to prove the truth of the matter asserted." The Department asserts that "the statement was offered by Investigator Jones to show there existed concerns that required investigation by the Department" but does not explain why the Department had "concerns" if it did not believe Alicia's statement. Nor has the Department explained how or why Alicia's statement was relevant if it was not offered to prove the truth of the matter asserted. If the only relevance of an out-of-court statement is to prove the truth of the matter asserted, then the statement is hearsay even though the proponent asserts that it is offered to prove only the fact that the statement was made. *See* Tex. R. Evid. 401 (defining "relevance"), 402 (only relevant evidence admissible), 801 (defining "hearsay"); *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 782–83 (Tex. App.—Dallas 2005, pet. denied) (rejecting argument that notes offered to prove truth of matters asserted were not hearsay but admissible as "operative facts" where notes had no relevance apart from truthfulness of assertions made therein); *Williams v. Ford Motor Co.*, No. 04-01-00839-CV, 2003 WL 21010601, at *1 (Tex. App.—San Antonio May 7, 2003, pet. denied) (mem. op.) (reasoning that either excluded reports were offered for truth of matters asserted and thus were perhaps "relevant" but were inadmissible hearsay "or the reports were not offered for their truth and were patently irrelevant"). We conclude that Alicia's statement to Investigator Jones "falls squarely within the definition of hearsay and therefore must

36

meet one of the hearsay exceptions to be admissible." *Volkswagen of Am., Inc*, 159 S.W.3d at 907.

We review a trial court's decision to admit evidence for an abuse of discretion. *Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620. An appellate court also must uphold the trial court's evidentiary ruling if the record shows any legitimate basis for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Under this standard, we cannot uphold the trial court's ruling admitting the hearsay testimony over Mother's objection. The proponent of hearsay has the burden of showing that the testimony fits within an exception[10] to the general rule prohibiting

---

[10]Mother primarily argues in her second issue that the trial court's ruling was error notwithstanding Section 104.006 of the Texas Family Code:

> In a suit affecting the parent-child relationship, a statement made by a child 12 years of age or younger that describes alleged abuse against the child, without regard to whether the statement is otherwise inadmissible as hearsay, is admissible as evidence if, in a hearing conducted outside the presence of the jury, the court finds that the time, content, and

the admission of hearsay evidence, *Volkswagen of Am., Inc*, 159 S.W.3d at 908 n.5, and the Department has wholly failed to meet that burden here. The Department has not articulated any exception to the rule against hearsay that applies to the challenged testimony, and we are aware of none. *See Robinson v. Warner-Lambert*, 998 S.W.2d 407, 411 (Tex. App.—Waco 1999, no pet.) ("Robinson has not cited any authority allowing such an exception to the hearsay rule[,] and we find none."). We hold that the trial court abused its discretion in overruling Mother's hearsay objection.

This error, however, was harmless. To obtain reversal of a judgment based on an error in the trial court, the appellant must show that the error occurred and that it probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court. Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005). We will not reverse a trial court's judgment because of an erroneous evidentiary ruling unless the ruling

---

circumstances of the statement provide sufficient indications of the statement's reliability and:

(1) the child testifies or is available to testify at the proceeding in court or in any other manner provided for by law; or

(2) the court determines that the use of the statement in lieu of the child's testimony is necessary to protect the welfare of the child.

Tex. Fam. Code Ann. § 104.006. We agree that this exception to the rule against hearsay does not apply to Alicia's statement to Jones. The trial court did not conduct the necessary hearing and make the findings required by the statute for the hearsay to be admissible under this provision.

probably, though not necessarily, caused the rendition of an improper judgment. *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 136 (Tex. 2012). The complaining party must usually show that the whole case turned on the evidence at issue. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh'g); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995). If erroneously-admitted or -excluded evidence was crucial to a key issue, then the error was likely harmful, but not conclusively or per se harmful. *Gunn*, 554 S.W.3d at 668. "Likely" does not mean "definitely," and "we apply the same standard—whether the erroneous exclusion of evidence probably caused the rendition of an improper judgment—even when the excluded evidence related to a key issue." *Id.* at 668–69, 671; *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 165 (Tex. 2015).

We examine the entire record in determining harm.[11] *Gunn*, 554 S.W.3d at 671; *U-Haul Int'l, Inc.*, 380 S.W.3d at 136. Error in admitting evidence is generally harmless if the rest of the evidence was so one-sided that the error likely made no difference. *Gunn*, 554 S.W.3d at 668; *JLG Trucking*, 466 S.W.3d at 165. Here, the record makes

---

[11]The Department argues that "the record establishes no harm occurred because the same purported hearsay matters were admitted at other places in the record without objection." The Department follows this contention in its brief with citations to the record where we find testimony about previous CPS history of Father and Mother. Because we conclude that the erroneously admitted hearsay was harmless for other reasons, we need not decide whether this other evidence in the record proved the same facts.

clear that the whole case did not turn on the evidence at issue, and as we have laid out in our foregoing analysis, the other evidence admitted at trial was *very* one-sided. The other evidence we have recited in our evidentiary-sufficiency review all came in without objection or over objections that Mother has not made into complaints on appeal. In light of the other evidence supporting the trial court's termination findings, the hearsay testimony was "not controlling on a material issue dispositive to the case" and was therefore harmless. *Interstate Northborough P'ship*, 66 S.W.3d at 220. Because the trial court's error is not reversible, we overrule Mother's second issue.

## IV. CONCLUSION

Having overruled both of Mother's issues on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: November 3, 2022